1   NIALL P. McCARTHY (SBN 160175)
    nmccarthy@cpmlegal.com
2   ERIC J. BUESCHER (SBN 271323)
    ebuescher@cpmlegal.com
3   **COTCHETT, PITRE & McCARTHY, LLP**
    840 Malcolm Road, Suite 200
4   Burlingame, CA 94010
    Telephone:   (650) 697-6000
5   Facsimile:   (650) 692-3606

6   *Attorneys for Plaintiffs*

7

8                  **UNITED STATES DISTRICT COURT**

9                 **NORTHERN DISTRICT OF CALIFORNIA**

10                    **SAN FRANCISCO DIVISION**

11

12  **ANGELA ANSANELLI**, an individual;          CASE NO. C-10-03892-WHA
    **CHARLES ANSANELLI**, an individual,
13                                                **SECOND AMENDED COMPLAINT
14                    Plaintiffs,                  FOR DAMAGES, RESTITUTION
                                                   AND INJUNCTIVE RELIEF**
15        v.

16  **JPMORGAN CHASE BANK, N.A;**                  **(1)   BREACH OF CONTRACT**
    **SEQUOIA PACIFIC MORTGAGE**                   **(2)   BREACH OF COVENANT OF
17  **COMPANY, INC.; and**                                GOOD FAITH AND FAIR
    DOES 1 through 25, inclusive,                         DEALING**
18                                                **(3)   FRAUD AND DECEIT,
                     Defendants.                         AND/OR NEGLIGENT
19                                                       MISREPRESENTATION
                                                  (4)   NEGLIGENCE
20                                                (5)   VIOLATION OF RESPA
                                                  (6)   VIOLATION OF UNFAIR
21                                                       COMPETITION LAW**

22                                                **JURY TRIAL DEMANDED**

23                                                Judge:      Hon. William Alsup

24

25

26

27

28

❀
LAW OFFICES
COTCHETT,
PITRE &
McCARTHY, LLP

# TABLE OF CONTENTS

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

        A.      Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

        B.      Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

        C.      Other Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        D.      Agency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        E.      Aiding and Abetting/Conspiracy . . . . . . . . . . . . . . . . . . . . . . . . 2

        F.      Alter Ego . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.    VENUE AND JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV.     TOLLING OF STATUTES OF LIMITATION BY FRAUDULENT
        CONCEALMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

V.      FACTUAL ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        A.      The Foreclosure Crisis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        B.      The HAMP Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        C.      JPMorgan's Obligations Under HAMP . . . . . . . . . . . . . . . . . . . . 5

        D.      JPMorgan's Purchase Of Washington Mutual . . . . . . . . . . . . . . . 8

        E.      Plaintiff's Purchase Of Their Home And the Subject Loans . . . . . . . . . . 8

        F.      Plaintiffs' Attempts To Modify The Loans With JPMorgan . . . . . . . . . . 11

VI.     CAUSES OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        FIRST CAUSE OF ACTION
        BREACH OF CONTRACT
        (Breach of Contract Against Defendant JPMorgan Chase Bank, N.A.) . . . . . . . . 16

        SECOND CAUSE OF ACTION
        BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
        (Breach of Covenant of Good Faith and Fair Dealing
        Against All Defendants) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
        Against Defendant JPMorgan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
        Against Defendant Sequoia Pacific Mortgage Company . . . . . . . . . . . . . . . . . . 21

THIRD CAUSE OF ACTION
FRAUD AND DECEIT AND/OR NEGLIGENT MISREPRESENTATION
(Fraud and Deceit, and/or Negligent Misrepresentation
Against All Defendants) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

FOURTH CAUSE OF ACTION
NEGLIGENCE
(Negligence - Cal. Civ. Code §§ 1714(a) and 3333
Against All Defendants) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

FIFTH CAUSE OF ACTION
VIOLATION OF RESPA
(Violation of 12 U.S.C. § 2605(e) (RESPA) - Failure to Respond to QWR
Against Defendant JPMorgan) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

SIXTH CAUSE OF ACTION
VIOLATION OF THE UNFAIR COMPETITION LAW
(For Unfair Competition in Violation of Cal. Bus. & Prof. Code § 17200 *et
seq.* Against All Defendants) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

**PRAYER FOR RELIEF** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

**DEMAND FOR JURY TRIAL** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

I.   **INTRODUCTION**

1.      Small business owners and home owners have been hit especially hard by the economic downturn during the past several years.  Plaintiffs Charles Ansanelli and Angela Ansanelli ("Plaintiffs") fit into each of these categories.  They purchased a home in 2000 and were persuaded to refinance that loan and take out equity from their home during the "boom" years by Defendant Sequoia Pacific Mortgage Company ("Sequoia") and Defendant JPMorgan Chase Bank ("JPMorgan" or "Chase") as well as by Washington Mutual Bank ("WaMu") prior to it being purchased by JPMorgan.  The result was more debt than the Plaintiffs could afford to pay, which Defendants and WaMu knew would be the case when they provided the refinance loan and a second loan to the Plaintiffs.  Unfortunately, instead of working with Plaintiffs to resolve these issues, Chase forced Plaintiffs to engage in a Sisyphean task of trying to receive a mortgage modification in order to reduce their debt and monthly payments to a manageable amount.

2.      As a result of the Defendants' conduct, Plaintiffs have been forced to take on significant debt in order to continue to make payments on their loans, they have just received notification that their home may be foreclosed upon, and Ms. Ansanelli's previously excellent credit has been tarnished and significantly damaged.  All of this is now coming to a head at a time when Plaintiffs are beginning to get back on their feet and their small business plans are recovering and expanding.

II.  **PARTIES**

A.   **Plaintiffs**

3.      Plaintiff Charles Ansanelli is, and at all times herein was, a resident of Marin County, California.

4.      Plaintiff Angela Ansanelli is, and at all times herein was, a resident of Marin County, California

B.   **Defendants**

5.      Defendant JPMorgan Chase Bank, N.A., ("JPMorgan" or "Chase") is a National Association organized under the laws of the United States, having its principle

1  place of business in Seattle, Washington.  JPMorgan conducts business in California.

2  JPMorgan purchased Washington Mutual Bank ("WaMu") on September 25, 2008.

3       6.       Defendant Sequoia Pacific Mortgage Company ("Sequoia") is a California

4  Corporation doing business in Marin County, California.[1]

5       **C.**   **Other Defendants**

6       7.       The true names and capacities, whether individual, corporate, associate, or

7  otherwise, of Defendants DOES 1 through 25 are unknown to Plaintiff, who therefore

8  sues said Defendants by such fictitious names pursuant to Code of Civil Procedure

9  section 474.  Plaintiff alleges that each of said fictitious Defendants is in some manner

10  responsible for the acts hereinafter set forth.  Plaintiff will amend this Complaint to show

11  the true names and capacities of these DOE Defendants, as well as the manner in which

12  each fictitious Defendant is responsible, when these facts are ascertained.

13       **D.**   **Agency**

14       8.       Plaintiffs are informed and believe, and on that basis allege, that at all times

15  herein mentioned each of the Defendants was an agent, servant, employee, and/or joint

16  venturer of each of the remaining Defendants, and was at all times acting within the

17  course and scope of such agency, service, employment, and/or joint venture, and each

18  Defendant has ratified, approved, and authorized the acts of each of the remaining

19  Defendants with full knowledge of said facts.

20       **E.**   **Aiding and Abetting/Conspiracy**

21       9.       Defendants, and each of them, aided and abetted, encouraged, and rendered

22  substantial assistance to the other Defendants in breaching their obligations to Plaintiffs,

23  as alleged herein.  In taking action, as alleged herein, to aid and abet and substantially

24  assist the commissions of these wrongful acts and other wrongdoings complained of, each

25

26  [1]     Plaintiffs filed their original and first amended complaints in Marin County Superior

27  Court prior to obtaining counsel.  Plaintiffs' current counsel was appointed through the Federal
Pro Bono Project by order of this Court on January 3, 2011.  The prior complaints named three

28  additional Defendants, the FDIC as receiver for WaMu, First American Title Company and
Fidelity National Title Company.  These Defendants have been dismissed from the case with
prejudice by Plaintiffs.

1 of the Defendants acted with an awareness of its/his/her primary wrongdoing and realized

2 that its/his/her conduct would substantially assist the accomplishment of the wrongful

3 conduct, wrongful goals, and wrongdoing.

4     **F.**    **Alter Ego**

5     10.    There is a unity of interest between Defendants, and each acts as the alter

6 ego of the other.

7 **III.**    **VENUE AND JURISDICTION**

8     11.    This matter was removed to this Court by the Federal Deposit Insurance

9 Corporation, who was formerly a Defendant in this action, on August 31, 2010. Counsel

10 for Plaintiffs were appointed through the Federal Pro Bono Project on January 3, 2011.

11     12.    This Court further has jurisdiction under 28 U.S.C. §§ 1331 and 1367 in

12 that Plaintiffs are intended, third-party beneficiaries to a contract between JPMorgan and

13 the U.S. Treasury that was entered into pursuant to and under the direction of the

14 Troubled Asset Relief Program ("TARP"). 12 U.S.C. § 5201 *et seq.*

15     13.    This Court has personal jurisdiction over the parties in this action by the

16 fact that Defendants are corporations that are licensed to do business in the state of

17 California or otherwise conduct business in the state of California.

18     14.    Venue is proper in this Court as the unlawful practices and conduct are

19 alleged to have been committed in Marin County, California. Plaintiffs' home, which is

20 the subject of this litigation, is in Marin County, California, all Defendants reside in this

21 district within the meaning of 28 U.S.C. § 1391©, and Defendants regularly conduct

22 business in this district.

23 **IV.**    **TOLLING OF STATUTES OF LIMITATION BY FRAUDULENT**

24     **CONCEALMENT**

25     15.    Any applicable statutes of limitation have been tolled by Defendants'

26 continuing, knowing and active concealment of the facts alleged herein. By virtue of

27 Defendants' concealment and misrepresentations to Plaintiffs, Plaintiffs could not and did

28 not discover Defendants' actions.

1        16.     In the alternative, Defendants should be estopped from relying on any

2   statutes of limitation.  Defendants owed Plaintiffs an affirmative duty of full and fair

3   disclosure, but knowingly failed to honor and discharge such duty.  Finally, Defendants'

4   conduct is not barred by any statutes of limitation because Defendants' conduct

5   constitutes an ongoing violation of Plaintiffs' rights, which continues to the present.

6   **V.      FACTUAL ALLEGATIONS**

7           **A.     The Foreclosure Crisis**

8        17.     For the past three years, the United States has been in a foreclosure crisis.

9   In late 2009, one in eight U.S. mortgages was in foreclosure or default, and 2.8 million

10  homeowners received foreclosure notices in 2009.

11       18.     California has been one of the states hardest hit by this crisis.  California

12  had the highest number of foreclosures in the United States for all of 2009.  RealtyTrac

13  reports that the number of total California properties with foreclosure filings in 2009 was

14  632,573.  This represents a nearly 21% increase over 2008 and a 153% increase from

15  2007.  In the first quarter of 2010, California posted the nation's fourth highest

16  foreclosure rate; during that period, California accounted for 23% of the nation's total

17  foreclosure activity.

18       19.     The foreclosure crisis "continues unabated," as a Congressional oversight

19  panel stated in April 2010.

20          **B.     The HAMP Program**

21       20.     Congress passed the Emergency Economic Stabilization Act of 2008, 12

22  U.S.C. § 5201 et seq., on October 3, 2008 and amended it with the American Recovery

23  and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115, on February 17, 2009

24  (together, the "Act").

25       21.     The purpose of the Act was to grant the Secretary of the Treasury the

26  authority to restore liquidity and stability to the financial system, and to ensure that such

27  authority is used in a manner that "protects home values" and "preserves

28  homeownership." 12 U.S.C. § 5201.

1      22.    The Act granted the Secretary of the Treasury the authority to establish the

2  Troubled Asset Relief Program, or TARP. 12 U.S.C. § 5211 et seq. Under TARP, the

3  Secretary may purchase or make commitments to purchase troubled assets from financial

4  institutions. Id. Congress allocated up to $700 billion to the Treasury for TARP. 12

5  U.S.C. § 5225.

6      23.    The Act further mandates, with regard to any assets acquired by the

7  Secretary of the Treasury that are backed by residential real estate, that the Secretary

8  "shall implement a plan that seeks to maximize assistance for homeowners" and use the

9  Secretary's authority over servicers to encourage them to take advantage of programs to

10  "minimize foreclosures." 12 U.S.C. § 5219. The Act grants authority to the Secretary of

11  the Treasury to use credit enhancement and loan guarantees to "facilitate loan

12  modifications to prevent avoidable foreclosures." *Id.*

13      24.    On February 18, 2009, pursuant to their authority under the Act, the

14  Treasury Secretary and the Director of the Federal Housing Finance Agency created the

15  Making Home Affordable ("MHA") initiative to help at-risk homeowners avoid

16  foreclosure by restructuring their mortgages.

17      25.    The Home Affordable Modification Program, or HAMP, is the portion of

18  the MHA initiative that provides mandatory directives for implementation, and with

19  which JPMorgan has not complied. HAMP creates a uniform loan modification protocol,

20  and provides financial incentives for participating servicers to modify loans. The

21  Treasury Department has allocated at least $75 billion in federal funds to HAMP, of

22  which at least $50 billion is TARP money, to keep up to "3 to 4 million homeowners" in

23  their homes by 2012.

24      **C.**    **JPMorgan's Obligations Under HAMP**

25      26.    JPMorgan accepted approximately $25 billion in federal funds and

26  additional loan guarantees. As a result, it was and is required to participate in HAMP for

27  the loans on which it functions as a loan "servicer." Michael R. Zarro, Jr., then a Senior

28

1  | Vice President of JP Morgan, executed a Servicer Participation Agreement ("SPA") with

2  | the federal government on July 31, 2009.

3  |      27.     The SPA executed by Mr. Zarro explicitly incorporates all "guidelines,"

4  | "procedures," and "supplemental documentation, instructions, bulletins, frequently asked

5  | questions, letters, directives, or other communications," referred to as "Supplemental

6  | Directives" issued by the Treasury, Fannie Mae or Freddie Mac in connection with

7  | HAMP. These documents together are referred to as the "Program Documentation" (SPA

8  | I.A.), and are incorporated by reference herein. The SPA mandates that a Participating

9  | Servicer "shall perform" the activities described in the Program Documentation "for all

10 | mortgage loans it services." SPA I.A., 2.A.5.

11 |      28.     Fannie Mae issued the first "Supplemental Directive" ("SD 09-01") in

12 | April, 2009.[2] That Directive, together with others issued since, sets out the activities

13 | JPMorgan must perform "for all mortgage loans it services." (SPA § 2.A.)

16 | / / /

---

18 | [2]     The Program Documentation also includes: Supplemental Directive 09-01 ("SD 09-01"),
19 | Apr. 6, 2009, https://www.hmpadmin.com/portal/docs/hamp_servicer/sd0901.pdf; Supplemental
   | Directive 09-07 ("SD 09-07"), Oct. 8, 2009,
20 | https://www.hmpadmin.com/portal/docs/hamp_servicer/sd0907.pdf; Supplemental Directive
   | 09-08 ("SD 09-08"), Nov. 3, 2009,
21 | https://www.hmpadmin.com/portal/docs/hamp_servicer/sd0908.pdf; Supplemental Directive
   | 10-01 ("SD 10-01"), Jan. 28, 2010,
22 | https://www.hmpadmin.com/portal/docs/hamp_servicer/sd1001.pdf; Supplemental
   | Documentation – Frequently Asked Questions – Home Affordable Modification Program
23 | ("HAMP FAQs"), Apr. 2, 2010,
   | https://www.hmpadmin.com/portal/docs/hamp_servicer/hampfaqs.pdf; Supplemental
24 | Documentation – Frequently Asked Questions – Home Affordable Modification Program
   | 2009-2010 Conversion Campaign ("HAMP Conversion FAQs"), Jan. 8, 2010,
25 | https://www.hmpadmin.com/portal/docs/hamp_servicer/hampconversionfaqs.pdf; Checklist for
   | Getting Started and Participating in HAMP for Non-GSE Loans, Guidance Effective for Verified
26 | Trial Period Plans, Feb. 22, 2010 ("HAMP Checklist"),
   | https://www.hmpadmin.com/portal/docs/hamp_servicer/hampchecklistverified.pdf; and Home
27 | Affordable Modification Program Base Net Present Value (NPV) Model Specifications ("NPV
   | Overview"), Jun. 11, 2009,
28 | https://www.hmpadmin.com/portal/docs/hamp_servicer/npvoverview.pdf (all last visited May
   | 13, 2010). These documents together describe the basic activities required under HAMP.

29.   First, JPMorgan must evaluate all borrowers who are sixty or more days in default, in "imminent default," or who request a loan modification to see if the loan and borrower meet basic eligibility criteria.[3] (SD 09-01 at 1-2, 3-4.)

30.   Next, the Servicer is required to calculate whether, by taking certain modification steps, such as reducing the interest rate or extending the term of the loan, the borrower's total housing payment can be reduced to 31% of the borrower's monthly income. (SD 09-01 at 8-10; HAMP Checklist at 6.)  Finally, the Servicer must perform a "net present value" ("NPV") analysis, comparing the net present value of cash flow from these modified loan terms to the NPV of the loan without modification. (SD 09-01 at 4-5; NPV Overview; HAMP FAQs at 27-29, Q2314.)

31.   If the NPV test yields a "positive" outcome (i.e., the value of a performing modified loan exceeds the value of foreclosing the property), the Servicer is required to offer a trial modification, or "Trial Period Plan," ("TPP") under HAMP. (SD 09-01 at 4, 14-15.)  Having gone through the analysis described in the preceding paragraph, the Servicer knows, prior to offering the TPP, all of the material terms of the proposed modification.  If the NPV test yields a "negative" outcome, the servicer is required to consider the borrower for other foreclosure prevention measures. (SD 09-01 at 4; SD 09-08 at 2-3.)

32.   The TPP consists of a three-month period in which the homeowner makes mortgage payments based on adjusted loan terms derived from the steps followed by the servicer under HAMP. (SD 09-01 at 17-18; SD 10-01 at 8.)

/ / /

---

[3]   Aside from criteria that require that the loan be a first lien mortgage originated before 2009, that the property be occupied, and that it be the borrower's principal residence, the most salient conditions are that the loan must be delinquent or that default is reasonably foreseeable; that the borrower document a financial hardship, as defined in the Program Documentation, and that the "borrower has a monthly mortgage payment ratio of greater than 31 percent" of the borrower's monthly income. (SD 09-01 at 1-2.)

**D.   JPMorgan's Purchase Of Washington Mutual**

33.   In September of 2008, WaMu suffered a severe decline in value and was taken over by the Office of Thrift Supervision with the Federal Deposit Insurance Corporation as Receiver for WaMu.

34.   On September 25, 2008 the FDIC as Receiver for WaMu and JPMorgan entered into a Purchase and Assumption Agreement.  Pursuant to that agreement, JPMorgan agreed to pay $1,888,000,000.00 to purchase WaMu.  The Purchase and Assumption Agreement does not specify a closing date for the transaction other than to state that the closing date will be "180 days after Bank Closing. . . .  The Receiver [FDIC], in its discretion, may extend the Settlement Date."  (Purchase and Assumption Agreement, Article I.)

35.   Pursuant to the Purchase and Assumption Agreement, JPMorgan serviced mortgages which were previously serviced by WaMu, including one of the loans at issue in this matter.

**E.   Plaintiff's Purchase Of Their Home And the Subject Loans**

36.   In April 2000, Plaintiffs purchased their home, located at 176 Wild Horse Valley Road, Novato, California (the "Home").  Plaintiffs paid a $500,000 down payment and Plaintiff Angela Ansanelli obtained a loan for the remaining $359,000.

37.   In March of 2006, Plaintiffs were suffering financially.  They own a small business which faltered and left them with limited income.  Defendant Sequoia assisted Plaintiffs in securing an offer from WaMu to allow Plaintiffs to refinance their high-interest mortgage with a lower interest loan based on Plaintiff Angela Ansanelli's flawless credit.  This transaction is referred to as Loan Number 3061620740.  It is referred to herein as the "Refinance Loan."

38.   In obtaining the Refinance Loan, Plaintiffs were led to believe that the offer was an exclusive benefit to borrowers with outstanding credit.  The loan contained a $200,000 cash out which Plaintiffs planned to use to help them through their immediate

1   financial crisis.  At the advice of Defendant Sequoia and WaMu, Plaintiffs removed Mr.
2   Ansanelli from the title to the home and used Mrs. Ansanelli's credit to qualify.

3       39.     The Refinance Loan was secured by a Deed of Trust recorded against the
4   Home.  At all times during the application, Plaintiffs were honest and forthcoming with
5   their financial information and complied with WaMu's requests.  WaMu did not perform
6   any credible analysis of Mrs. Ansanelli's ability to repay the Refinance Loan, including
7   but not limited to a verification of her income, assets, or debt-to-income ration.  Instead,
8   both WaMu and Defendant Sequoia represented to Plaintiffs that based on WaMu's
9   analysis of the financial information Mrs. Ansanelli provided, she would be able to meet
10  all loan payments and urged her to enter into the transaction.

11      40.     The Refinance Loan was a no document, interest only loan, secured by the
12  Home, based on what Sequoia and WaMu knew to be an unreasonably inflated appraisal
13  value, which was procured by WaMu and Sequoia in order to permit WaMu to make the
14  Refinance Loan.  After obtaining the Refinance Loan from WaMu, Mr. Ansanelli was
15  added back onto the title by means of an Interspousal Transfer Grant Deed.

16      41.     One year later, in April 2007, Plaintiff's financial situation had continued to
17  deteriorate.  A second time they used Defendant Sequoia to procure a loan in order to
18  have a safety net for their family.  Sequoia arranged for a $200,000 Home Equity Loan
19  for Plaintiffs through JPMorgan Chase Bank, N.A.  This transaction is referred to as
20  Reference Number 070781310420 or Account Number 0918463286.  It is referred to
21  herein as the "HEL."

22      42.     The HEL was also a no document, interest only loan.  The amount of the
23  monthly payment was calculated based on a 360 month term, but the HEL required a
24  balloon payment after 180 months.

25      43.     In April 2007, Plaintiffs signed a closed-end Deed of Trust securing the
26  HEL with the Home.

27

28  / / /

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

1    44.    In processing the HEL, Defendants JPMorgan and Sequoia did not perform
2    a credible analysis of Plaintiffs' ability to repay the loan. Defendant Sequoia executed the
3    entire HEL loan application with no input from Plaintiffs.

4    45.    Defendants Sequoia and JPMorgan represented to Plaintiffs that, based on
5    JPMorgan's analysis of the financial information suppled by Sequoia, they would be able
6    to meet the obligations of the HEL. Plaintiffs signed the pre-completed loan documents
7    under the direction of Sequoia. The HEL was also based on an appraisal contracted by
8    Sequoia. This appraisal was knowingly and unreasonably inflated.

9    46.    As a result of these two loans, the Home secured $785,000 of debt and
10   Plaintiffs were obligated to make monthly payments which were well beyond their means.

11   47.    Plaintiffs believed at all times that Defendants JPMorgan and Sequoia were
12   acting in good faith and in Plaintiffs' best interests. Plaintiffs trusted Defendants to
13   competently assist them throughout the loan process. Plaintiffs had no knowledge of real
14   estate transactions. Contrary to Plaintiffs' belief at the time, Defendants JPMorgan and
15   Sequoia and WaMu conspired to induce Plaintiffs into signing two predatory loans which
16   Defendants knew or should have known Plaintiffs would be unable to repay.

17   48.    In September of 2008, Mr. Ansanelli was forced to undergo knee surgery
18   which immobilized him for nearly one year and drastically reduced his ability to work.
19   Plaintiffs also incurred other serious and expensive family medical issues. In January
20   2009 the sewer pipes under Plaintiff's home ruptured due to a root infestation requiring
21   extensive and expensive repair and replacement. These unexpected and unforeseen
22   events put Plaintiffs in an incredibly precarious financial position.

23   49.    Plaintiffs borrowed money and struggled along, and were able to fulfill their
24   obligations under the loans and make all loan payments on both the Refinance Loan and
25   HEL for a year and a half. However, by November 2008, Plaintiffs recognized they could
26   not sustain the full monthly payments on the loans and were in imminent danger of
27   default.

28

**F.   Plaintiffs' Attempts To Modify The Loans With JPMorgan**

50.   In December 2008, Plaintiffs contacted WaMu and JPMorgan to request a modification to the Refinance Loan and HEL in order to reduce their monthly payments and attempt to avoid defaulting.  Plaintiffs did not receive a response until March of 2009 to their request.[4]

51.   On February 13, 2009, Plaintiffs filed a complaint with the Office of the Comptroller of the Currency ("OCC") which included a letter of hardship and their complete financial file.  Plaintiffs sent copies of this letter to WaMu and JPMorgan and again requested a loan modification for each of their loans.

52.   On March 4, 2009, Plaintiffs received letters from WaMu and JPMorgan responding to the filing of the OCC complaint, indicating and assuring them that the matter was being investigated and promising a prompt response to the matter.

53.   During the time between March 4, 2009 and August 10, 2009 JPMorgan (at times acting as WaMu) dragged the Plaintiffs along through a slow, frustrating, redundant and fraudulent modification process.  JPMorgan continually demanded piecemeal and duplicative paperwork, indicated that the file was both complete and incomplete and that the process was stalled and proceeding.

54.   JPMorgan systematically ignored Plaintiffs written and verbal inquiries and misled Plaintiffs about the status of their modification request in order to extract full payments from Plaintiffs and to discourage Plaintiffs from seeking legal counsel.

55.   On August 10, 2009, Plaintiffs received a letter on JPMorgan letterhead stating that their request to modify the Refinance Loan had been denied purportedly because their Loan To Value ("LTV") ratio was too low and because Plaintiffs allegedly had excessive cash reserves.  Both the LTV calculation and the cash reserve amount on which the denial was based were erroneous and known to be erroneous by JPMorgan.

---

[4]   Defendant JPMorgan kept the Refinance Loan and HEL separate during the modification process.  However, JPMorgan was responsible for servicing both loans, although for much of the time it continued to do so in WaMu's name.  Plaintiffs repeatedly requested that the two loans be considered for consolidation together, yet Defendant JPMorgan refused to do so.

56.     Plaintiffs' attempt to modify the HEL was equally muddled, frustrating and contradictory.  JPMorgan's "processing" of the modification request lasted three months and Plaintiffs were informed that their file was both complete and incomplete and that the process was both stalled and proceeding.

57.     On June 8, 2009, JPMorgan agreed to place Plaintiffs on a trial modification plan, guaranteeing that the modification would become permanent if Plaintiffs made payments on time and in full for the three month trial period, which covered the months of June, July and August of 2009.  Plaintiffs requested this Trial Plan Agreement in writing.[5]  JPMorgan, however, refused to provide the agreement in writing, with the intention of disavowing the agreement if it became advantageous for them to do so.

58.     Plaintiffs made timely payments of the modified amount in June, July and August of 2009.

59.     On August 17, 2009, Plaintiffs received a letter from JPMorgan stating that the HEL was "currently in default."  This came as a surprise to Plaintiffs as they had never missed a payment and had made the three trial period payments as required and requested by JPMorgan.  Plaintiffs contacted JPMorgan and spoke to Mr. Mike Harris about their concerns.  Mr. Harris represented that Plaintiffs' trial payments were being held in a suspense account, were not being applied correctly and that default notices were sent out automatically.  Additionally, Mr. Harris indicated that the defaults would adversely affect Plaintiffs' credit rating.

60.     This information was **directly in conflict** with representations made by Mr. Chuck Ely, and employee of JPMorgan, at the outset of the trial payment period.  Mr. Ely stated that the Plaintiffs' credit would remain intact and would not be affected by the trial modification.

_____

[5]     At the time they made this request the JPMorgan had not yet signed the SPA under HAMP.  However, JPMorgan knew of the requirements of the HAMP program and likely knew of their planned participation in that program.  Additionally, before the conclusion of the trial period for the Plaintiffs' HEL modification, JPMorgan signed the SPA.

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

61.     The damage done to the Plaintiffs' credit made it impossible for them to obtain financial products and loans from other institutions to assist Plaintiffs in making the full payments on their Refinance Loan and HEL.

62.     Plaintiffs were told that the representative who initiated Plaintiffs Trial Plan Agreement had been transferred to another department and that Plaintiffs could not speak with him about their modification agreement.

63.     Plaintiffs spoke with Mr. Roger Conner, yet another JPMorgan employee who represented to Plaintiffs that they were still current on their trial modification plan and instructed them to continue paying the modified amount. This information was given to Plaintiffs despite the fact that they were receiving collection calls from JPMorgan as early as 7 a.m. during this time period. Plaintiffs again sought to receive written confirmation or a written Trial Plan Agreement from JPMorgan. Again, JPMorgan deliberately refused to provide this information with the intent of disavowing the agreement in the future.

64.     On September 10, 2009, after paying the modified payments for four months, Plaintiffs were contacted by Ms. Olga Danilova, a JPMorgan employee and informed that Plaintiffs did not have enough funds to qualify for a modification to the HEL. Ms. Danilova further indicated that all payments going forward needed to be of the full amount, and that the "outstanding balance" needed to be paid to JPMorgan, which inexplicably included late fees and penalties as a result of paying the lower, agreed upon modified amount. Amazingly, this meant that Plaintiffs had been denied modification of the Refinance Loan because they had "excessive" cash reserves and "denied" modification of the HEL because they did not have enough cash reserves. This "denial" occurred after Plaintiffs had fully complied with their obligations under the trial agreement by making on time payments of the modified amount for more than three months.

65.     The next day, on September 11, 2009, confused, bewildered and frustrated by the modification process, Plaintiffs contacted the executive offices of JPMorgan to

1  contest the cancellation of their modification.  Mr. Steve Regul, a JPMorgan employee,

2  represented to Plaintiffs that JPMorgan would work with them on a modification plan for

3  both the HEL and Refinance Loan.

4        66.    One week later, Mr. Bob Smith, a JPMorgan employee, contacted Plaintiffs

5  to "finalize" their loan modification.  As part of this process Mr. Smith requested all of

6  the financial documents and information which Plaintiffs had provided to JPMorgan

7  several times during the previous six months.

8        67.    At the same time JPMorgan was allegedly "finalizing" the loan

9  modifications, the payments Plaintiffs were making on the HEL were taking progressively

10  longer to post to their account.  This resulted in Mr. Smith informing Plaintiffs on

11  October 14, 2009 that the trial payment for September had not been made.  Plaintiffs

12  produced detailed payment records demonstrating that the payments had been made and

13  had cleared Plaintiffs' checking account on time.  Mr. Smith admitted that the problem

14  was an accounting error by JPMorgan.  Mr. Smith instructed Plaintiffs to continue paying

15  the modified amounts and to ignore the default notices.  Mr. Smith represented that all

16  future payments would be accurately and properly applied to their account.

17        68.    Despite JPMorgan's representation that both loans would be modified and

18  despite the agreement between JPMorgan and Plaintiffs to modify the HEL if Plaintiffs

19  made on time payments for three months, JPMorgan refused to provide any information

20  in writing about the modifications.  Between October 11, 2009 and February 19, 2010,

21  Plaintiffs contacted JPMorgan several times to ensure that they were still on the

22  modification plan for the HEL.  Each time JPMorgan confirmed that they were, but for

23  the first time represented that the HEL modification would not become permanent until

24  the Refinance Modification was approved.

25        69.    On February 19, 2010 Plaintiffs received a letter from JPMorgan thanking

26  them for participating in HAMP and informing them that their file was missing critical

27  documents necessary to evaluate their modification request as required by the Trial Plan

28  Agreement previously sent to them.  Plaintiffs had never received a written Trial Plan

1  Agreement, despite their repeated requests for written verification and agreement about
2  the modification plan, and had sent all the necessary documentation to JPMorgan several
3  times.

4      70.    Plaintiffs ceased making the modified payments on the HEL in February
5  2010. Plaintiffs have not missed any payments and are current on the Refinance Loan.
6  The Refinance Loan is currently scheduled to reset to a significantly higher monthly
7  payment and interest rate in April, 2011. Plaintiffs fear they will not be able to make
8  these payments unless the loan is modified.

9      71.    In order to make the payments, Plaintiffs were forced to borrow more than
10  $60,000 against their credit cards, cashed out approximately $400,000 in equity from their
11  home and approximately $100,000 on a line of credit through Bank of America.[6]

12      72.    On December 2, 2009, Plaintiffs sent an official Qualified Written Request
13  ("QWR") as defined by the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. §
14  2605(e)(1)(B), to JPMorgan stating and detailing the reasons for Plaintiffs' belief that
15  their HEL account was in error. Plaintiffs received an acknowledgment of receipt of the
16  QWR from Ms. Kay Jackson, an employee at JPMorgan's Home Lending Executive
17  Office on January 6, 2010. The acknowledgment promised that JPMorgan would provide
18  a "complete and accurate response as soon as possible." Plaintiffs have never again heard
19  from Ms. Jackson or the Home Lending Executive Office regarding their QWR. This was
20  the second QWR sent to JPMorgan by Plaintiffs.

21      73.    On or about January 20, 2011, Plaintiffs received a letter from JPMorgan
22  indicating that the HEL was in default and that foreclosure proceedings had been initiated
23  on the account. The letter provided a phone number for the California Reconveyance
24  Corporation, who was identified as the "foreclosure attorneys" for JPMorgan and
25  instructed Plaintiffs to contact them for further information. That phone number, (813)
26  775-2340, was and continues to be inactive.

27

28  [6]    Plaintiffs no longer have the credit line through Bank of America as a result of the
damage done to their credit by the actions of JPMorgan in issuing notices of default on the HEL
even though Plaintiffs were making timely payments.

## VI.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### BREACH OF CONTRACT

### (Breach of Contract

### Against Defendant JPMorgan Chase Bank, N.A.)

74.   Plaintiffs reallege each and every allegation above as if set forth in its entirety in this Cause of Action.

75.   Plaintiffs entered into an oral Trial Period Plan ("TPP") contract with JPMorgan regarding the HEL.  JPMorgan made an oral TPP offer to Plaintiffs on or about June 8, 2009.  Plaintiffs formed a binding, enforceable agreement with JPMorgan when they made the three trial period payments in June, July and August of 2009.[7]  Payments made in accordance with the oral TPP offer constitute consideration.  In the alternative, the TPP Contracts or offers, coupled with Plaintiffs' payments constitutes an implied contract.

76.   JPMorgan failed to perform under the TPP contract with Plaintiffs. JPMorgan's refusal to perform its duties under the TPP contract was unlawful, without justification and/or excuse, and constituted a total and material breach of the TPP contract between the parties.

77.   JPMorgan breached the TPP contract with Plaintiffs by failing to offer Plaintiffs a permanent HAMP modification after payment of the trial period payments was made on time and in full.

78.   Plaintiffs gave consideration that was fair and reasonable, and have performed all conditions, covenants, and promises required to be performed under their contract with JPMorgan.

79.   As a result of JPMorgan's breach of the TPP contract, Plaintiffs suffered and continue to suffer reasonable and foreseeable consequential damages, including payment of increased interest, longer loan payoff times, higher principle balances,

---

[7]   Plaintiffs made payments pursuant to the TPP from June 2009 through February 2010.

1   deterrence from seeking other remedies to address their default and/or unaffordable
2   mortgage payments, damage to their credit, additional income tax liability, costs and
3   expenses incurred to attempt to prevent and fight pending foreclosure, and other damages
4   for breach of contract.

5       80.     On July 31, 2009 JPMorgan and the United States (through Fannie Mae
6   acting as Financial Agent of the United States) entered into the Servicer Participation
7   Agreement ("SPA") which is a valid and enforceable contract.

8       81.     Plaintiffs are intended third-party beneficiaries under the SPA, and the SPA
9   states the express intention that "homeowners who are in default and . . . who are at
10  imminent risk of default" be granted modification to reduce "monthly payments to
11  sustainable levels." (SD 09-01 at 1.)

12      82.     By entering into the SPA, JPMorgan agreed to comply with the
13  requirements set forth in the SPA and the Program Documentation incorporated by
14  reference into the SPA. In exchange, Treasury agreed to pay certain amounts set forth in
15  the SPA and the Program Documentation to JPMorgan in consideration of its compliance
16  with the SPA.

17      83.     The central purpose of the SPA is to ensure that borrowers whose loans are
18  serviced by JPMorgan and who are eligible for loan modifications under HAMP are
19  properly considered for modification in compliance with the Program Documentation
20  requirements incorporated in the SPA.

21      84.     JPMorgan failed to perform under its SPA contracts in a manner that
22  directly impacts Plaintiffs. JPMorgan's refusal to perform the SPA contracts was
23  unlawful, without justification and/or excuse, and constituted a total and material breach.

24  85.         JPMorgan breached the SPA by doing, inter alia, the following:

25          a.      Failing to properly determine whether Plaintiffs qualify for HAMP
26                  modifications by checking investor restrictions and/or performing
27                  and NPV test;

28

1     b. Imposing requirements on Plaintiffs not permitted under the SPA

2       and Program Documentation;

3     c. Failing to follow the process required to determine eligibility for

4       modifications, including, without limitation, failing to consider

5       documentation properly submitted in support of Plaintiffs' HAMP

6       applications, and demanding documentation that was not required;

7     d. Failing to obtain waivers or approvals from the investor, if

8       necessary, to carry out modifications under HAMP; and

9     e. Failing to timely convert temporary modifications into permanent

10       modifications in the manner required by the SPA

11  86. As a result of JPMorgan's breach of the SPA, Plaintiffs suffered and will

12 continue to suffer reasonable and foreseeable consequential damages, including payment

13 of increased interest, longer loan payoff times, higher principle balances, deterrence from

14 seeking other remedies to address their default and/or unaffordable mortgage payments,

15 damage to their credit, additional income tax liability, costs and expenses incurred to

16 prevent or fight foreclosure, and other damages for breach of contract.

17  87. Plaintiffs have been damaged by JPMorgan's breach of the TPP contract in

18 an amount to be proven at trial.

19  88. Plaintiffs have been damaged by JPMorgan's breach of the SPA contract in

20 an amount to be proven at trial.

21  89. Pursuant to California Code of Civil Procedure § 1021.5, Plaintiffs are

22 entitled to recover reasonable attorney's fees, costs, and expenses incurred in bringing

23 this action.

24

25

26

27 / / /

28



1

## SECOND CAUSE OF ACTION

2

## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

3

### (Breach of Covenant of Good Faith and Fair Dealing

4

### Against All Defendants)

5       90.    Plaintiffs reallege each and every allegation above as if set forth in its

6   entirety in this Cause of Action.

7                                  **Against Defendant JPMorgan**

8       91.    Under common law, a covenant of good faith and fair dealing is implied in

9   every contract, including the written and oral TPP contracts described above, which

10  prevents one contracting party from unfairly frustrating the other party's right to receive

11  the benefits of the contract. JPMorgan is obligated to act in good faith and deal fairly

12  Plaintiffs pursuant to the oral TPP contract.

13      92.    JPMorgan has violated and continues to violate this covenant of good faith

14  and fair dealing in its TPP contracts with Plaintiffs by doing, inter alia, the following:

15              a.    Failing to perform loan servicing functions consistent with its

16                    responsibilities to Plaintiffs;

17              b.    Failing to properly supervise its agents and employees, including

18                    without limitation, its loss mitigation and collection personnel,

19                    foreclosure personnel, and personnel implementing its modification

20                    programs;

21              c.    Failing to permanently modify loans and/or provide alternatives to

22                    foreclosure and using unfair means to keep Plaintiffs in a temporary

23                    modification contract, including, without limitations, routinely

24                    demanding information it already had and failing to communicate

25                    accurately or consistently with Plaintiffs about the status of their loan

26                    modification applications;

27              d.    Making inaccurate calculations and determinations of Plaintiffs'

28                    eligibility for trial or permanent modifications;

e.   Failing to respond, or respond in a timely manner, to Plaintiffs' request to be evaluated for a modification under HAMP, even after Plaintiffs provided all information requested by JPMorgan;

f.   Shuffling and transferring Plaintiffs back and forth between different representatives, who often providing conflicting information and instructions;

g.   Failing to properly determine whether Plaintiffs qualified for HAMP modifications by checking investor restrictions and/or performing an NPV test;

h.   Imposing requirements on Plaintiffs not permitted under the SPA and Program Documentation;

i.   Failing to follow the process required to determine eligibility for modifications, including, without limitations, failing to consider documentation properly submitted in support of Plaintiffs' HAMP applications, and demanding documentation that is not required;

j.   Failing to obtain waivers or approvals from the investor, if necessary, to carry out modifications under HAMP;

k.   Failing to timely convert temporary modifications into permanent modifications in the manner required by the SPA;

l.   Failing to dedicate sufficient resources to properly operate the HAMP program, and transferring persons whom Plaintiffs had contact with out of the modification department so as to avoid allowing Plaintiffs to contact the same person at JPMorgan regarding the status of their modification;

m.   Telling Plaintiffs, who mailed or faxed requested information to JPMorgan that JPMorgan did not receive the requested information;

n.   Telling Plaintiffs that they qualify for a trial period plan, then failing to send an official trial plan agreement;

1                o.      Telling Plaintiffs, without legitimate basis, that they will "work"

2                    with them to get a permanent modification, then failing to do so and

3                    denying the modification; and

4                p.      Intentionally setting up its loan modification program to fail.

5      93.     Plaintiffs remain ready, willing, and able to enter into permanent HAMP

6 modifications.

7      94.     As a result of JPMorgan's breach of this implied covenant, Plaintiffs

8 suffered and will continue to suffer reasonable and foreseeable consequential damages

9 resulting from such breaches, including payment of increased interest, longer loan payoff

10 times, higher principle balances, and other damages.

11               **Against Defendant Sequoia Pacific Mortgage Company**

12      95.     Under common law, a covenant of good faith and fair dealing is implied in

13 every contract, including the contract between Plaintiffs and Sequoia which resulted in

14 the origination of the Refinance Loan and HEL, which prevents one contracting party

15 from unfairly frustrating the other party's right to receive the benefits of the contract.

16      96.     Additionally, as broker and fiduciary for both loans, Sequoia owed an

17 independent duty to Plaintiffs to act in good faith to make, and facilitate the making of,

18 decisions in Plaintiffs' best interests.

19      97.     Sequoia violated this covenant of good faith and fair dealing in its contracts

20 with Plaintiffs to broker the Refinance Loan and HEL by doing, inter alia, the following:

21                a.      Steering Plaintiffs into two no document, interest only loans with

22                    reason to know that Plaintiffs had no ability to repay the loans;

23                b.      Completing the loan applications for Plaintiffs and ensuring that they

24                    would qualify for the Loans;

25                c.      Failing to disclose the predatory nature of the loan agreements to

26                    Plaintiffs;

27

28

d.   Relying upon appraisals of Plaintiffs' Home which it knew to be unreasonably inflated and crafted solely for the purpose of ensuring that Plaintiffs would qualify for the loans;

e.   Failing to disclose to Plaintiffs the risks involved in obtaining the loans; and

f.   Encouraging Plaintiffs to strip the equity from their Home.

98.   Defendant Sequoia's behavior caused Plaintiffs to enter into the Loan Agreements. As a result, Plaintiffs' credit has been destroyed, they have been forced to borrow excessive amounts of money, the equity has been stripped from their home and they are facing foreclosure.

99.   Plaintiffs have been damaged by Sequoia's breach of the implied covenant of good faith and fair dealing in an amount to be proven at trial.

100.   Plaintiffs have been damaged by JPMorgan's breach of the implied covenant of good faith and fair dealing in an amount to be proven at trial.

101.   Pursuant to California Code of Civil Procedure § 1021.5, Plaintiffs are entitled to recover their reasonable attorney's fees, costs, and expenses incurred in bringing this action.

## THIRD CAUSE OF ACTION

## FRAUD AND DECEIT AND/OR NEGLIGENT MISREPRESENTATION

### (Fraud and Deceit, and/or Negligent Misrepresentation

### Against All Defendants)

102.   Plaintiffs reallege each and every allegation above as if set forth in its entirety in this Cause of Action.

103.   Defendants colluded in the facilitation and procurement of the Refinance Loan and the HEL, which were predatory in nature and injurious to Plaintiffs.

104.   Defendants at various times throughout the origination and servicing of the loans knowingly misrepresented, inter alia, the following:

a.   The nature and terms of the loans;

1                    b.       That the loans were a good financial decision for Plaintiffs;

2                    c.       The modification process of the loans; and

3                    d.       The value of the Plaintiffs' Home which was used to justify the

4                            loans.

5      105.   Defendants' knowingly or negligently defrauded Plaintiffs, causing them to
6 agree to enter into loans which Defendants knew Plaintiffs were unlikely to ever be able
7 to pay off. Because of Plaintiffs' desperation and desire to stay in their Home, they
8 justifiably relied on Defendants' misrepresentations about the terms of the loans, their
9 ability to afford the loans and the value of their home. This reliance was detrimental to
10 the Plaintiffs.

11     106.   Defendant JPMorgan falsely represented to Plaintiffs that the trial
12 modification of the HEL loan would become permanent if Plaintiffs remitted the
13 modified payment for three months, on time and in full. JPMorgan knew this was false,
14 per its own policies and procedures. Defendant JPMorgan intentionally or negligently
15 misrepresented to Plaintiffs that they were still on a trial modification plan, when in fact,
16 Plaintiffs' modified payments were being recorded as insufficient. Plaintiffs justifiably
17 relied on these statements as JPMorgan is the servicer and originator of the HEL loan and
18 had authority to approve the requested modification. JPMorgan's misrepresentation
19 resulted in escalating late fees, penalties and other charges and ultimately sent the HEL
20 into default and now places the Home at risk of foreclosure.

21     107.   Defendant Sequoia committed fraud when it knowingly misrepresented
22 Plaintiffs' income on the loan applications. Plaintiffs did not report, nor were they asked
23 to report their actual income for the purpose of determining whether they qualified for the
24 loans. Defendant Sequoia knew of the falsity because, without the confidential
25 employment information that could **only** be supplied by Plaintiffs, the income information
26 included on the application is necessarily false. Sequoia intentionally entered the false
27 information on the applications in order to qualify Plaintiffs for predatory loans which
28 they had no ability to repay.

1    108.   It was in Sequoia's best interest to see that all loans it brokers be

2    consummated, regardless of ability to repay or propriety of entering into the loans.

3    Plaintiffs justifiably relied on Defendant Sequoia to comply with reasonable standards of

4    professional conduct and ethics in using its expertise to match them with an appropriate

5    loan product.

6    109.   As a result of Defendants' misrepresentations, Plaintiffs have been

7    damaged in an amount to be proven at trial.

8    110.   Pursuant to California Code of Civil Procedure § 1021.5, Plaintiffs are

9    entitled to recover their reasonable attorney's fees, costs, and expenses incurred in

10   bringing this action.

11                         **FOURTH CAUSE OF ACTION**

12                              **NEGLIGENCE**

13              **(Negligence - Cal. Civ. Code §§ 1714(a) and 3333**

14                        **Against All Defendants)**

15   111.   Plaintiffs reallege each and every allegation above as if set forth in its

16   entirety in this Cause of Action.

17   112.   All Defendants owed a duty of care to avoid foreseeable injury to Plaintiffs

18   person or property. Defendants breached that duty by colluding to lure Plaintiffs into

19   predatory loans that Defendants knew or should have known Plaintiffs would default on.

20   113.   As a direct and foreseeable result of Defendants' behavior, Plaintiffs

21   suffered harm, including but not limited to the destruction of their credit, being forced to

22   borrow excessive amounts of money, having the equity stripped from their home and,

23   now, facing foreclosure.

24   114.   Defendant JPMorgan processed and approved the HEL under a "Stated

25   Income" program that requires employment verification but does not require income

26   verification. WaMu processed and approved the Refinance Loan under a "Stated

27   Income" program that requires employment verification but does not require income

28   verification. JPMorgan has assumed liability for WaMu's negligence.

1    115. Both WaMu and JPMorgan had a duty to investigate the reasonableness of

2    the stated income and confirm that Plaintiffs had the ability to repay the loans. WaMu

3    and JPMorgan breached that duty when they qualified Plaintiffs for the Refinance and

4    HEL loans based on the overstated income supplied by Defendant Sequoia.

5    116. WaMu and JPMorgan also breached their duty when the qualified Plaintiffs

6    for the initial interest-only payment, with knowledge that the initial interest-only payment

7    was scheduled to convert to a fully amortized payment. WaMu and JPMorgan failed to

8    qualify Plaintiffs at the fully indexed, fully amortized payment amount.

9    117. Defendant Sequoia was negligent in directing Plaintiffs into loans for which

10   they were not qualified. Sequoia was Plaintiff's broker in the origination of both the

11   Refinance Loan and HEL. As Plaintiffs' broker and fiduciary, Sequoia owed a duty to

12   Plaintiffs to execute decisions in the best interests of the Plaintiffs. Sequoia breached that

13   duty when it negligently qualified Plaintiffs for loans without reasonable (or any)

14   investigation into whether or not Plaintiffs could sustain payments on the loans.

15   Defendant made no effort to educate Plaintiffs as to the nature, risks or possible

16   consequences associated with the loans.

17   118. As a result of Defendants' conduct, Plaintiffs have and will continue to

18   suffer reasonable and foreseeable consequential damages resulting from such actions and

19   representations, including payment of increased interest, longer loan payoff times, higher

20   principle balances, deterrence from seeking other remedies to address their default and/or

21   unaffordable mortgage payments, damage to their credit, additional income tax liability,

22   costs and expenses incurred to prevent or fight foreclosure, and other damages for breach

23   of contract.

24   119. Plaintiffs have been damaged by Defendants' actions and representations in

25   an amount to be proven at trial.

26

27

28   / / /

1

**FIFTH CAUSE OF ACTION**

2

**VIOLATION OF RESPA**

3

**(Violation of 12 U.S.C. § 2605(e) (RESPA) - Failure to Respond to QWR**

4

**Against Defendant JPMorgan)**

5         120.    Plaintiffs reallege each and every allegation above as if set forth in its

6    entirety in this Cause of Action.

7         121.    Plaintiffs sent a QWR to Defendant JPMorgan on two occasions, August

8    26, 2009, and December 2, 2009. Pursuant to 12 U.S.C. § 2605(e)(2), Defendant had

9    sixty (60) days to respond to the QWR and twenty (20) days to acknowledge receipt of the

10   QWR.

11        122.    The August 26, 2009 correspondence from Plaintiffs to JPMorgan stated the

12   names of Plaintiffs and their partial account numbers, information sufficient to identify

13   the account of the borrower. The letter further stated the errors Plaintiffs believed

14   JPMorgan was making in misapplying loan payments, based on their paying a modified

15   amount on their HEL and seeking to ensure that the mistaken actions JPMorgan was

16   taking did not hurt their credit and seeking corrections of those mistakes by JPMorgan.

17        123.    The December 2, 2009 correspondence from Plaintiffs to JPMorgan

18   included the name and loan numbers (for both the Refinance Loan and the HEL) of

19   Plaintiffs. The letter further stated it was a "Qualified Written Request" under RESPA.

20   Enclosed with the December 2, 2009 letter was a letter sent from Plaintiffs to the OCC

21   detailing Plaintiffs belief as to why their account was in error and the actions taken by

22   JPMorgan which Plaintiffs believed were incorrect in denying the modifications and

23   misapplying payments.

24        124.    JPMorgan violated RESPA because it failed to provide a written response

25   acknowledging receipt of the first QWR within 20 days of the receipt of the first request.

26   JPMorgan also failed to make appropriate corrections to Plaintiffs' account in response to

27   this QWR, or to investigate or to explain why it would not or could not do so.

28

125.   Plaintiffs received acknowledgment of the receipt of the second QWR on January 6, 2010.  However, Plaintiffs never received any further response to their QWR.

126.   Defendant JPMorgan thus violated RESPA by failing to make appropriate corrections to Plaintiffs' account in response to any of their QWRs, or to investigate or to explain why it would or could not do so.

127.   Upon information and belief, JPMorgan has violated RESPA, 12 U.S.C. § 2605(e)(3), by providing information to consumer reporting agencies regarding overdue payments allegedly owed by Plaintiffs that were related to their QWRs, many of which were neither late nor overdue.

128.   Defendant JPMorgan has engaged in a pattern and practice of non-compliance with the requirements of RESPA set forth in 12 U.S.C. § 2605, as evidenced by its failure to respond to Plaintiffs' two QWRs.  Upon information and belief Plaintiffs allege that Defendant JPMorgan has engaged in a much broader pattern and practice of failing to comply with RESPA by not responding to QWRs.

129.   As a result of JPMorgan's violations of RESPA Plaintiffs have suffered actual damages, including but not limited to devastation of their credit, monetary damages, and threatened foreclosure of their home.

130.   Pursuant to 12 U.S.C. § 2605(f)(1)(B), Plaintiffs are entitled to statutory damages in the amount of $2,000 per violation plus their actual damages.

131.   Pursuant to 12 U.S.C. § 2605 (f)(3), Plaintiffs are entitled to reasonable attorneys fees in connection with this action.

## SIXTH CAUSE OF ACTION

### VIOLATION OF THE UNFAIR COMPETITION LAW

**(For Unfair Competition in Violation of Cal. Bus. & Prof. Code § 17200 *et seq.***

**Against All Defendants)**

132.   Plaintiffs reallege each and every allegation above as if set forth in its entirety in this Cause of Action.

1       133.   The California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et

2  seq. ("UCL"), defines unfair competition to include any "unlawful," "unfair," or

3  "deceptive" business act or practice.  Cal. Bus. & Prof. Code § 17200.  The UCL

4  authorizes this Court to issue whatever orders or judgments may be necessary to prevent

5  unfair or unlawful practices, or to "restore to any person in interest any money or

6  property, real or personal, which may have been acquired by means of such unfair

7  competition."  Id. § 17203.

8       134.   JPMorgan's acts and practices alleged herein are unlawful business

9  practices in that they violate state and law, including but not limited to violations of

10  RESPA and Cal. Civ. Code §§ 1714(a) and 3333, as alleged in this Complaint.

11       135.   Sequoia's acts and practices alleged herein are unlawful business practices

12  in that they violate state law, including but not limited to violations of Cal. Civ. Code §§

13  1714(a) and 3333.

14       136.   JPMorgan's acts and practices alleged herein constitute unfair business

15  practices, including, without limitation, the following practices:

16            a.   Failing to perform loan servicing functions consistent with its

17               responsibilities to Plaintiffs and its responsibilities under HAMP;

18            b.   Failing to properly supervise its agents and employees, including

19               without limitation, its loss mitigation and collection personnel,

20               foreclosure personnel, and personnel implementing its modification

21               programs;

22            c.   Failing to permanently modify loans and/or provide alternatives to

23               foreclosure, and using unfair means to keep Plaintiffs in temporary

24               modification contracts, including, without limitations, routinely

25               demanding information it already had and failing to communicate

26               accurately or consistently with Plaintiffs about the status of their loan

27               modification applications;

28

1            d.       Making inaccurate calculations and determinations of Plaintiffs'

2                   eligibility for permanent modifications; and

3            e.       Engaging in acts and practices that prolong of the HAMP process.

4        137.    Sequoia's acts and practices alleged herein constitute unfair business

5 practices, including, without limitation steering Plaintiffs into loans Sequoia knew

6 Plaintiffs could not ever repay and breaching the fiduciary duty owed to Plaintiffs in order

7 to increase its own profits by closing the mortgage transaction.

8        138.    JPMorgan's acts and practices alleged herein constitute fraudulent business

9 practices, including, without limitation, the following practices:

10            a.       JPMorgan made misrepresentations and omissions of material facts

11                   that induced Plaintiffs to enter TPP contracts in order to obtain a

12                   permanent modification;

13            b.       JPMorgan made misrepresentations and omissions of material fact

14                   regarding the status of Plaintiffs' loan modifications and loan

15                   payments;

16            c.       JPMorgan's misrepresentations and omissions are likely to deceive

17                   the reasonable consumer, and did in fact deceive Plaintiffs;

18            d.       JPMorgan's misrepresentations are objectively material to the

19                   reasonable consumer, and therefore reliance upon such

20                   representations may be presumed as a matter of law, and Plaintiffs

21                   did in fact believe the misrepresentations were reasonable and did in

22                   fact rely upon them.

23        139.    Sequoia's acts and practices as alleged herein constitute fraudulent business

24 practices, including, without limitation making misrepresentations and omissions of

25 material facts that induced Plaintiffs to enter into predatory loans which they could not

26 repay.

27        140.    Plaintiffs justifiably and reasonably relied upon these misrepresentations

28 and omissions of material facts.

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

1    141.   As a result of these violations and unlawful, unfair, and fraudulent business

2  practices, Plaintiffs suffered injury in fact and lost money, including but not limited to,

3  payment of increased interest, longer loan payoff times, higher principle balances, and

4  payment of other charges collected by JPMorgan.

5    142.   Pursuant to California Business and Professions Code section 17200 *et seq.*,

6  Plaintiffs are entitled to enjoin the practice of unfairly denying and failing to enter into

7  permanent loan modifications for homeowners who have complied with the contractual

8  obligations of a TPP Contract, and grant such other and further relief as the Court may

9  deem proper and just.

10    143.   Pursuant to Code of Civil Procedure § 1021.5, Plaintiffs are entitled to

11  recover their reasonable attorney's fees, costs, and expenses incurred in bringing this

12  action.

13                          **PRAYER FOR RELIEF**

14    WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

15    1.    For Equitable relief, including an Order for JPMorgan to rescind all Notices

16  of Default against Plaintiffs' account and to engage in reasonable efforts to restore

17  Plaintiffs' credit to its previous standing;

18    2.    The Court grant a Temporary Restraining Order preventing foreclosure

19  against the Plaintiffs' Home;

20    3.    The Court enter a judgment declaring JPMorgan's acts and practices

21  complained of herein to constitute a breach of contract, and all Defendants' acts and

22  practices complained of herein to constitute a breach of the covenant of good faith and

23  fair dealing and to be unlawful, unfair and fraudulent as well as a declaration that

24  JPMorgan is required by the doctrine of promissory estoppel to offer permanent

25  modifications of the loans to Plaintiffs;

26    4.    For injunctive relief against Defendants to prevent future wrongful conduct;

27    5.    For actual statutory damages according to proof at trial for violations of the

28  Rosenthal Act, breach of contract, breach of covenant of good faith and fair dealing, and

1 | promissory estoppel, or in the alternative, that JPMorgan be ordered to make restitution to
2 | Plaintiffs pursuant to Cal. Bus. and Prof. Code § 17203;

3 |     6.      For punitive damages pursuant to Cal. Civ. Code § 3294 *et seq.*;

4 |     7.      For an award of attorneys' fees and costs pursuant to Cal. Code of Civ.
5 | Proc. § 1021.5, Cal. Civ. Code §§ 1788.17 and 1788.30©, and 12 U.S.C. § 2605(f)(3);

6 |     8.      For such other and further relief as this Court may deem proper.

7 | Dated: February 3, 2011                    **COTCHETT, PITRE & McCARTHY, LLP**

10 |                                   By:      /s/ Niall P. McCarthy
                                               NIALL P. McCARTHY
11 |                                            ERIC J. BUESCHER
                                               *Attorneys for Plaintiffs*

1

## DEMAND FOR JURY TRIAL

2     Plaintiffs hereby demand a trial by jury of each and every claim so triable.

3

Dated: February 3, 2011                     **COTCHETT, PITRE & McCARTHY, LLP**

4

5

6                                    By:     _____/s/ Niall P. McCarthy_____
                                            NIALL P. McCARTHY
7                                            ERIC J. BUESCHER
                                            *Attorneys for Plaintiffs*
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY, LLP